# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

|  |  |  |
|---|---|---|
| Serenity L. | : | |
| c/o Ohio Justice & Policy Center | : | |
| 215 E. Ninth Street, Suite 601 | : | **CASE NO. 1:10-CV-00076** |
| Cincinnati, Ohio 45202, | : | |
| | : | |
| Anthony G. | : | **Judge Sandra Beckwith** |
| c/o Ohio Justice & Policy Center | : | |
| 215 E. Ninth Street, Suite 601 | : | **Magistrate Judge Tim Hogan** |
| Cincinnati, Ohio 45202, | : | |
| | : | |
| Robert W. | : | |
| c/o Ohio Justice & Policy Center | : | **FIRST AMENDED CLASS ACTION** |
| 215 E. Ninth Street, Suite 601 | : | **COMPLAINT FILED PURSUANT TO** |
| Cincinnati, Ohio 45202, | : | **FRCP 15(a)(1)(B)** |
| | : | |
| Diane F. | : | **(Jury Trial Demanded)** |
| c/o Ohio Justice & Policy Center | : | |
| 215 E. Ninth Street, Suite 601 | : | |
| Cincinnati, Ohio 45202, | : | |
| | : | |
| Helen W. | : | |
| c/o Ohio Justice & Policy Center | : | |
| 215 E. Ninth Street, Suite 601 | : | |
| Cincinnati, Ohio 45202, | : | |
| | : | |
| David B. | : | |
| c/o Ohio Justice & Policy Center | : | |
| 215 E. Ninth Street, Suite 601 | : | |
| Cincinnati, Ohio 45202, | : | |
| | : | |
| Alan ("Al") G. | : | |
| c/o Ohio Justice & Policy Center | : | |
| 215 E. Ninth Street, Suite 601 | : | |
| Cincinnati, Ohio 45202, | : | |
| | : | |
| Alice G. | : | |
| c/o Ohio Justice & Policy Center | : | |
| 215 E. Ninth Street, Suite 601 | : | |
| Cincinnati, Ohio 45202, | : | |

John V.
c/o Ohio Justice & Policy Center
215 E. Ninth Street, Suite 601
Cincinnati, Ohio 45202,

Guy B.
c/o Ohio Justice & Policy Center
215 E. Ninth Street, Suite 601
Cincinnati, Ohio 45202,

and

John Doe, Jane Doe, and all others similarly
situated,

**Plaintiffs**,

vs.

Ohio Department of Rehabilitation and
Correction
770 West Broad Street
Columbus, Ohio 43222,

Ernie L. Moore, in his official capacity as
Director of ODRC
770 West Broad Street
Columbus, Ohio 43222

Ohio Department of Mental Health
30 East Broad Street, 8th Floor
Columbus, Ohio 43215-3430, and

Sandra Stephenson, in her capacity as Director
of ODMH
30 East Broad Street, 8th Floor
Columbus, Ohio 43215-3430,

**Defendants**.

Also served on:

Ohio Attorney General Richard Cordray
30 E. Broad St., 17th Floor
Columbus, OH 43215

## NATURE OF THE ACTION

1.     This is a class action for prospective declaratory and injunctive relief brought by indigent Ohio residents with psychiatric disabilities who are currently incarcerated in an Ohio prison under the supervision of the Ohio Department of Rehabilitation and Correction ("ODRC") and are soon to be released or who have recently been released from an Ohio prison. Plaintiffs and members of the proposed plaintiff class have psychiatric disabilities whose symptoms interfere with major life activities such as thinking, concentrating, interacting with others, caring for oneself, working, and remembering and processing information.  They are qualified to participate in reentry, parole, conditional release or post-release supervision programs, but require disability accommodations in the form of pre-release planning and appropriate services in order to be successful in transitioning into a community.  Due to their lack of financial resources, Plaintiffs and the class they represent are also qualified for one or more public benefits programs, but require accommodations for their disability in the form of assistance with pre-release applications and post-release services to obtain and maintain access to programs for which they are eligible and which they require.  Plaintiffs and the class they represent have been or will imminently be injured by the ODRC's failure to provide these necessary disability accommodations as their psychiatric disabilities prevent them from being able to adequately transition into a community on their own.

2.     For inmates with psychiatric disabilities, an abrupt and unprepared reentry into a community or entry into some form of post-release supervision represents an enormous barrier to a successful transition.  When inmates with psychiatric disabilities are released into communities without required accommodations, they are often unable to meet requirements that may condition their release or make use of the referrals, counseling, and services available in the

communities they inhabit, if those services are available. In many communities into which inmates with psychiatric disorders are released, needed services are minimal and inadequate or non-existent.  As a result, they experience predictable and preventable exacerbations of their symptoms and they also face arrest for even non-criminal behavior that may constitute a technical violation of the conditions of their release.

3. In the report of the Criminal Justice/Mental Health Consensus Project, issued in 2002, the Council of State Governments, advised by representatives of leading criminal justice and mental health organizations, wrote:

> For inmates with mental illness, whose community adjustment issues are even more complex than inmates in the general population, the need for systemic discharge planning is particularly crucial.  For example, individuals with mental illness leaving prison without sufficient supplies of medication, connections to mental health and other support services, and housing are almost certain to decompensate, which in turn will likely result in behavior that constitutes a technical violation of release conditions or a new crime.

4. In order for inmates with psychiatric disabilities to be able to transition to a community and "to successfully connect as productive members of society," they must be provided with adequate pre-release planning.

5. This action seeks to redress the failure of ODRC and ODMH to provide required accommodations to inmates with mental disabilities, their failure to put in place structures and programs to allow these accommodations to take place and the related failure to train and supervise their employees to insure that class members receive the accommodations, including, but not limited to "sufficient supplies of medication, connections to mental health and other support services, and housing," to which they are entitled under the law.  This action also seeks to redress the disparate impact of ODRC's actions and policies on individuals with serious psychiatric disabilities, insofar as this disparate impact results from ODRC's failure to help plan

4

for inmates' release and failure to provide all necessary services for their successful reintegration into the community.

**PARTIES**

A. **Plaintiffs / Class Representatives**

**Serenity L.**

6.        Serenity L. is 31 years old.  She was released from Franklin Pre-Release Center ("FPRC") in Columbus, Ohio on November 20, 2008, after first being incarcerated at Ohio Reformatory for Women ("ORW") for several months.  Serenity was released to Post Release Control ("PRC") for a period extending until November 22, 2009.  She is currently residing in Xenia, Ohio with a boyfriend.

7.        Serenity had her first child when she was only 16.  Within six years, she gave birth to three more children.  When she was 22, her fourth baby died.  Soon thereafter, her brother, father and step-mother also died.  The pain and stress of these tragedies led Serenity to use drugs and ultimately, as a result of crack cocaine abuse, she ended up incarcerated in county jail.

8.        After this first incarceration, Serenity was diagnosed with post-traumatic stress disorder and bipolar disorder.   While incarcerated at ORW, she was further diagnosed as suffering from schizophrenia.  She has taken the drugs Trazadone, Seroquel and Remeron for these conditions.

9.        Despite several stints in drug rehabilitation facilities, Serenity has been in constant contact with the criminal justice system since she was 22.  She has amassed a lengthy criminal record that includes four felonies and 23 misdemeanors.  She has been incarcerated in three different Ohio counties and has been on house arrest, in addition to her incarceration in state prison.

5

10.     Because of her significant psychiatric disabilities, Serenity endures incapacitating anxiety and panic attacks.  She finds it very difficult to get out of bed in the morning and often feels as though she would prefer to "die in a hole somewhere." She has suicidal thoughts, difficulty concentrating and is easily overwhelmed.  She has attempted suicide in the past.  When she is properly medicated, Serenity feels stable and "more confident about her future."

11.     Prior to her release from ORW and FPRC, Serenity was not provided with discharge planning.  She was not afforded assistance in filling out complex benefits applications. As her release date approached, Serenity grew increasingly anxious.  She was not released with Medicaid or Social Security benefits and has no source of income.  Serenity was released on PRC and is fearful that her inability to meet her own basic needs, to pay her child support obligations, and to maintain psychiatric stability will make it impossible to meet the obligations of her release.

12.     Based on information and belief, Serenity's repeated contact with the criminal justice system and her inability to successfully transition into her community are direct results of the ORDC's failure to provide Serenity with required pre-discharge planning and assistance.   .

13.     Further, based on information and belief, it is imminently likely that Serenity will be reincarcerated due to the ORDC's  repeated failure to assist her in her transition from prison into society and will again be deprived of the necessary pre-discharge planning this action seeks to redress.

**Anthony G.**

14.     Anthony G. is 41 years old and was released from Oakwood

6

Correctional Facility in Lima, Ohio on March 20, 2009.   He is currently committed to Summit Behavioral Healthcare in Cincinnati, Ohio.

15.     Anthony has been diagnosed with bipolar disorder with unspecified psychosis.  He has a lengthy history of mental illness which dates back to his childhood. Anthony has a history of alcohol and drug abuse.  He has been institutionalized for most of his adult life and has a lengthy juvenile record.  He has been hospitalized at least nine times for psychiatric inpatient care.  Anthony has been incarcerated twice in state prison.   He has been arrested at least nine times since 1987 and has been incarcerated in county jail several times.

16.     Over the years, he has taken the medications Respirdol, Lithium, Depakote, Thorazine, Geondon, Tegretol, Zyprexa, Haldol, Lithobid, and Depakene.

17.     Because of his psychiatric disabilities, Anthony causes frequent non-violent disturbances and is prone to digging through other people's belongings.  He has poor impulse control, has exposed himself and masturbated in public, engages in loud outbursts and screams when he does not get what he wants.  He has trouble controlling his bladder, which leads him to wet the bed and occasionally urinate in public.  He had a history of smearing feces in his cell.  Proper medication helps Anthony function more appropriately.

18.     Anthony made numerous threats that he would hang himself while incarcerated.  He has a history of being placed on suicide watch and has threatened to cut his own throat.

19.     After his recent release from Oakwood Correctional Facility, Anthony was dropped off at an emergency shelter in Cincinnati by an ODRC vehicle.  Anthony was not afforded any substantive pre-release planning prior to leaving ODRC custody despite his significant psychiatric disabilities and an assessment by ODRC personnel that he needs "close

case management services as he is lower functioning…"  He was not provided with any comprehensive assistance in filling out complex applications for Social Security benefits, Medicaid or food stamps.  At the time of his release, Anthony was not connected with a case worker and no one assisted him in obtaining appropriate supportive housing.  He was not released with any benefits for which he is eligible and was only given a meager 14-day supply of the medications he desperately needs to maintain stability.

20.     A social worker at the emergency shelter recognized Anthony's considerable psychiatric disabilities and assisted him in scheduling an appointment with a county funded agency where Anthony was able to get his medications refilled.   Also, the social worker assisted Anthony in filling out applications for Medicaid, and food stamps.

21.     Less than three weeks after ODRC abandoned Anthony at an emergency shelter, he announced at a crowded food bank that he had a gun.   Anthony was delusional.  He did not, in fact, have any weapon.  He was once again arrested, this time for "inducing panic".

22.     Anthony was promptly locked up in the Hamilton County Justice Center. He remained incarcerated for one month.  He was found to be incompetent to stand trial for the "inducing panic" charge before was transferred to Summit Behavioral Healthcare in Cincinnati to "restore his competency."

23.     With no arrangements for appropriate supportive housing, it is likely that Anthony will be released once again to an emergency shelter.  Without benefits, mental health treatment or resources to meet his basic needs, Anthony will struggle to survive in the chaotic shelter environment.

24.     Based on information and belief, Anthony's incarceration for "inducing panic" and his current committal to a mental facility are direct results of the ORDC's failure to provide Anthony with required pre-discharge planning and assistance.

25.     Further, based on information and belief, it is imminently likely that Anthony will be reincarcerated due to the ORDC's repeated failure to assist him with his transition from prison into society and will again be deprived of the necessary pre-discharge planning this action seeks to redress.

**Robert W.**

26.     Robert W. is 36 years old and was released from Pickaway Correctional Institution in Orient, Ohio on November 19, 2008.   He is currently homeless and resides in intermittent shelters in Franklin County, Ohio.

27.     Robert has been diagnosed with bipolar disorder and depression.  He has been plagued by psychiatric and learning disabilities since childhood and has experienced panic attacks since age twelve.  He suffers from severe and often crippling anxiety, mood instability, chronic depression and paranoia.   Over the years, Robert has taken the medications Lithium, Cymbalta, Xanax, Buspar, Eskalith, Depakote, Rozerem and Abilify.

28.     Robert has a long history of substance abuse and is opioid dependent. He takes methadone to address this dependence. Robert is positive for Hepatitis C and also has a chronic and often incapacitating back ailment, which requires medication.

29.     In addition to his recent incarceration in state prison, he has been incarcerated at least 12 times in three different Ohio counties.

30.     Robert has difficulty focusing and he has limited short-term memory.

31.     He is a chronic insomniac who suffers from debilitating and unpredictable anxiety and panic attacks, severe irritability, racing thoughts and anger management issues.   It is not uncommon for Robert to endure three panic attacks per day.   Proper medication stabilizes these symptoms.

32.     Several months prior to his recent release from state prison, a case manager filled out an application for Social Security benefits on Robert's behalf.  The application was filled out quickly on the internet while he waited and, as a result, was incomplete and improperly submitted.  Less than a month prior to his release, Robert's application was denied.  He was offered no other assistance in obtaining these benefits or Medicaid benefits, which he had prior to this incarceration.

33.     After his recent release from Pickaway Correctional Institution, Robert was taken by ODRC van to the Greyhound bus station in Columbus, Ohio.  Despite his complex psychiatric disabilities, he was not released with arrangements for supportive housing, benefits or case management.  He was given only a 14-day supply of medication and $65.00.

34.     For several months after his release, Robert was able to reside at a YMCA. However, when funding was cut for this residential program on July 1, 2009, Robert was rendered homeless and has been residing in various shelters since this time.

35.     When untreated, Robert's psychiatric and physical disabilities limit many life activities and impair his ability to interact with others. He is impulsive and easily agitated, leading him to pick fights and act out aggressively.  He has been unable to work for years due to an injury he suffered while working in construction and received workers' compensation prior to his incarceration.

36.     Robert is confident that he can succeed in remaining psychologically stable and sober if he is provided the reasonable accommodations, benefits and services that he needs.

37.     Based on information and belief, Robert's repeated contact with the criminal justice system and his inability to successfully transition into his community are direct results of the ORDC's failure to provide Robert with required pre-discharge planning and assistance.

38.     Further, based on information and belief, it is imminently likely that Robert will be reincarcerated due to the ORDC's  repeated failure to assist him with his transition from prison into society and will again be deprived of the necessary pre-discharge planning this action seeks to redress.

**Diane F.**

39.     Diane F. is 38 years old and was released from ORW in Marysville, Ohio on December 1, 2009.  Since 1999, she has been released from prison six times.

40.     Diane has been diagnosed with schizophrenia and bipolar disorder. She has suffered from incapacitating psychological disabilities for most of her adult life.  She has taken the drugs Wellbutrin, Lithium and Trazadone.  When she is not medicated, she is paranoid, anxious and chronically depressed.  Diane is easily overwhelmed and becomes discouraged when she is unable to complete tasks.  She is a substance abuser who habitually retreats to drugs and alcohol when her psychological status becomes unmanageable.  When Diane is properly medicated, she is calm, coherent and feels stable.

41.     Diane has been incarcerated five times in state prison.  She has never been provided with pre-release assistance in completing complex benefits applications.  Each time

Diane is released from prison, she is sent back to the same drug-infested neighborhood in Cuyahoga County, where she quickly reverts to drug use and criminal behavior.  Diane recognizes the importance of staying far away from this area and she repeatedly articulated to her case manager that she would like to be sent to a half way house in Montgomery Country post-release.  Despite her pleas, Diane was, once again, released to a halfway house in Cuyahoga County.  She is very anxious about returning to her old neighborhood.  Diane repeatedly requested assistance with benefits applications and did not receive any guidance.

42.    Because Diane has no source of income and no medical benefits, she is terrified that she will encounter significant difficulty in obtaining the medication she desperately needs.   She fears returning to a community of people with whom she has engaged in drug abuse and criminal activity and is increasingly anxious and frustrated by her current situation.  Her acute psychiatric disabilities and lack of appropriate discharge planning put her at serious risk of decompensating, once again.

43.    Based on information and belief, Diane's repeated contact with the criminal justice system and her inability to successfully transition into her community are direct results of the ORDC's failure to provide her with required pre-discharge planning and assistance.

44.     Further, based on information and belief, it is imminently likely that Diane will be reincarcerated due to the ORDC's  repeated failure to assist her with her transition from prison into society and will again be deprived of the necessary pre-discharge planning this action seeks to redress.

**Helen W.**

45.     Helen W. is 49 years old.  Helen was released from ORW on November 22, 2009.  Helen was released to PRC for a period extending until November 22, 2010.  She is currently residing in Cleveland, Ohio with her elderly mother.

46.     Helen has been diagnosed with bipolar disorder and schizophrenia.  She suffers from anxiety, chronic depression, paranoia and difficulty with impulse control.  Her disabilities make it difficult for her to concentrate and complete basic tasks, including filling out forms.  She has taken the medications Trazadone, Lithium, Xanax, and Wellbutrin for her psychological disabilities.  She is currently medicated and feels stable.

47.     Helen has suffered with debilitating mental illness most of her life.  She has been chronically involved with the criminal justice system and incarcerated for much of her adult life.  She has been imprisoned in county jail at least six times and in state prison twice.

48.     Helen has no source of income.  She realizes the importance of applying for Social Security benefits and Medicaid in order to get psychiatric attention.  Despite Helen's repeated requests, she never received the help she needed in planning for her release.  The complex process of applying for benefits is anxiety provoking for Helen.  Helen was released on PRC and she is fearful that she will be unable to comply with the requirements of her release without comprehensive case management and the medication she needs.

49.     Helen was released without benefits and the resources to meet her basic needs.  Her ability to support herself and to meet her own needs is limited by her psychiatric condition.  Helen believes that she can be successful in meeting the requirements of her release to PRC if she is provided with reasonable services and timely provision of the benefits that she needs.

50.     Based on information and belief, Helen's repeated contact with the criminal justice system and her inability to successfully transition into her community are direct results of the ORDC's failure to provide her with pre-discharge planning and assistance.

51.      Further, based on information and belief, it is imminently likely that Helen will be reincarcerated due to the ORDC's  repeated failure to assist her with her transition from prison into society and will again be deprived of the necessary pre-discharge planning this action seeks to redress.

**David B.**

52.     David B. is 44 years old.  He was released from North Coast Correctional Treatment Facility ("NCCTF") in Grafton, Ohio on September 15, 2008.   David suffers from depression and paranoid schizophrenia.  He has taken the drugs Prozac, Remeron, Seroquel, Celexa, Zyprexa and Hydroxine.  He is chronically anxious and depressed and battles persistent insomnia. He has been treated for his mental health issues in several inpatient facilities.  When he is properly medicated, he feels stable.

53.     David has a long history of drug and alcohol abuse.  He has been in several inpatient and outpatient treatment facilities to address his acute addiction issues.

54.     He has acute high blood pressure, diabetes and persistent back problems. All of these chronic conditions require medication.  It is problematic for David to manage all of the medications that are required to stabilize his physical and psychological disabilities.

55.     David has a hard time maintaining employment when he is mentally unstable.  He is a carpenter by trade, but has difficulty with anger management and has been in workplace fights.  Since his release, David has been unable to maintain stable employment.

56.     Prior to his release from prison, David was not provided with guidance in filling out applications for Social Security benefits or Medicaid.  He was not offered linkage to mental health service providers or a case worker.  He was only provided a short term supply of medication.

57.     After he was released from NCCTF, David did not know where to turn for help or to refill his medications.  He was not able to secure an appointment with a mental health care provider until nearly two months after his release.  David quickly ran out of medication and was suffering from physical pain, high blood pressure and debilitating anxiety.

58.     David's paranoia and anxiety, coupled with his physical impairments, limit his ability to support himself and meet his own basic needs.  David is confident that he can maintain his stability if he is provided the benefits and services that he needs.

59.     Based on information and belief, David's current mental and physical impairments are direct results of the ORDC's failure to provide him with required pre-discharge planning and assistance.

60.     Further, based on information and belief, it is imminently likely that David will be reincarcerated due to the ORDC's  repeated failure to assist him with his transition from prison into society and will again be deprived of the necessary pre-discharge planning this action seeks to redress.

**Alan G.**

61.     Alan ("Al") G. is 47 years old and was released from Lorain Correctional Institution in London, Ohio on January 12, 2009.   After this release, he was homeless and lived in a van near Cleveland.  As of May 3, 2010, Al resides in the Cuyahoga County jail.  He was convicted in April 2010 of theft and breaking and entering – charges stemming from being

15

observed searching for scrap metal in a dumpster.  Al currently awaits sentencing.  He is frantic

and worried about the likelihood of returning to prison.

62. Al has been diagnosed with bipolar disorder and schizophrenia.  He also

suffers from antisocial disorder and post-traumatic stress disorder.  He has struggled with mental

illness for his adult life and currently takes the medication Seroquel, which helps stabilize his

conditions.  He has also taken the drugs Depakote, Geodon, Remeron, Respirdal, Depakene,

Prozac and Congentin.

63. Because of his psychiatric disabilities, Al suffers from debilitating

depression and has a difficult time with anger management.  He suffers from paranoid delusions,

insomnia, poor impulse control and intense mood swings.  He has attempted suicide at least four

times by either overdosing on drugs or attempting to hang himself and was on suicide watch

during his ODRC incarceration.  Al hears voices and has a difficult time concentrating due to

racing thoughts.  These auditory hallucinations occur daily and tell him to kill himself or hurt

others.

64. Al's symptoms and auditory hallucinations are mitigated by regular

administration of medication.

65. Al is a chronic drug abuser who states that he resorts to street drugs to

"self medicate" when he is not on a stable course of medication.

66. Al has been incarcerated six times in state prison in Ohio for aggravated

robbery, drug possession and assault.  He is currently on PRC.  He has never been provided with

any comprehensive discharge planning prior to release.  Al was not offered effective assistance

with benefits applications and he was not linked to a specific case worker or agency.  In fact, one

benefits application completed by an ODRC case manager after a single interview, without any

review of his mental health records, greatly minimized the severity of Al's psychiatric

disabilities.  Not surprisingly, that claim was denied.  On release, he was given $75.00 and a two-

week supply of medication.

       67.    Al has no source of income and no money to buy gas for the van in which

he lives.  He is extremely paranoid of living with other people and refuses to go to a homeless

shelter for fear of "catching a disease."  He applied for Social Security and Medicaid benefits

post release on his own accord.  These applications are pending.  He is receiving mental health

care through a county-funded organization.  Al is sometimes forced to skip meals and go hungry.

       68.    Hindered by significant psychological disabilities and lack of stable

housing and income, Al has been unable to avoid further contact with the criminal justice

system.

       69.    Based on information and belief, Al's repeated contact with the criminal

justice system and his inability to successfully transition into his community are direct results of

the ORDC's failure to provide him with required pre-discharge planning and assistance.

       70.    Further, based on information and belief, it is imminently likely that Al

will be reincarcerated due to the ORDC's  repeated failure to assist him with his transition from

prison into society and will again be deprived of the necessary pre-discharge planning this action

seeks to redress.

**Alice G.**

       71.    Alice G. is 58 years old.  She was released from ORW, Marysville, Ohio

on October 20, 2007.  Within three months, she violated the conditions of her PRC and was

declared a violator-at-large.  She was restored to PRC compliance on July 30, 2008 without

returning to prison.  Her latest release from ORW, on October 20, 2007, is not her only recent

release.  Alice was previously released on November 9, 2006, but she then violated the conditions of her PRC and was returned to prison on June 28, 2007.

72.     Alice was diagnosed with schizophrenia in 2006.  She has suffered from incapacitating psychological disabilities for most of her adult life, beginning in her early 20's. She began to hear voices in 1979 and continues to hear voices but is able to ignore them while on her medications. When she is not medicated, she is paranoid, anxious, chronically depressed and has poor impulse control, especially with anger management.

73.     She has a history of attempting suicide by overdose as a result of command hallucinations.

74.     At various times throughout her illness, she has been placed on the following medications: Risperdal, Seroquel, Valporic Acid, Trazodone, Depakone, Desyrel, Risperidone, Abilify, Zyprexa, Haloperidol, and Geodon.

75.      Without assistance from case workers, provided by a non-profit reentry program, Alice finds daily tasks overwhelming and discouraging.  She has difficulty maintaining personal hygiene, and following proper medication regimens.  She is a past substance abuser who habitually retreats to drugs and alcohol when her psychological status becomes unmanageable, as evidenced by more than fifty misdemeanor convictions over the past thirty years for various offenses, including, but not limited to soliciting, petty theft, disorderly conduct, criminal trespass and loitering.  When Alice is properly medicated and receiving assistance with daily tasks, she is calm, coherent and feels stable and safe.

76.     Alice has three felony convictions.  Because of her convictions and related probation violations, she has been incarcerated in ODRC prison facilities three times.

18

77.     Although diagnosed with schizophrenia and provided with medication and treatment while in prison, Alice was not provided with guidance in filling out applications for Social Security benefits or Medicaid prior to any of her releases from prison.

78.     When she was scheduled to be released on November 9, 2006, she was only offered discharge planning three days prior to her release date.  In the Community Linkage Packet prepared for that release, she was referred to "Central Access at Rescue Crisis" in Toledo for an intake assessment with "Joe the clinician" on November 27, 2006, four days after her two week supply of medications had been exhausted.

79.     For her most recent release in October 2008, Alice was provided with no discharge planning, with no Community Linkage Packet, and with no referral to any mental health professionals following her release.  She was simply released with a two week supply of medication.

80.     Following her release from prison, her ability to function and her condition stabilized once she was back in her community only because she, fortuitously, began receiving services from a community reentry program.  Her stabilization did not occur as the result of any action taken by defendants ODRC or ODMH prior to or at the time of her release from prison.

81.     Based on information and belief, Alice's repeated contact with the criminal justice system and her inability to successfully transition into her community are direct results of the ORDC's failure to provide her with required pre-discharge planning and assistance.

82.     Further, based on information and belief, it is imminently likely that Alice will be reincarcerated due to the ORDC's  repeated failure to assist her with her transition from

prison into society and will again be deprived of the necessary pre-discharge planning this action seeks to redress.

**John V.**

83.     John V. is 52 years old.  He was released from Trumbull Correctional Institution in Leavittsburg, Ohio on February 11, 2010.

84.     John is diagnosed with bipolar disorder with psychotic features.  He currently takes the following medications: Risperdal, Depakote, Paxil, and Wellbutrin.  He also suffers from substance abuse.

85.     This release concludes an eight-year prison sentence, his fourth incarceration with ODRC since 1982.  He came to Trumbull Correctional Institution on December 9, 2009, after spending six years at Southern Ohio Correctional Facility (SOCF) in Lucasville.  He received intensive care on the Residential Treatment Unit at SOCF for five years.  He also served time in Arkansas.

86.     On several occasions. John has been hospitalized for feeling suicidal.

87.     Several months before his scheduled release, beginning at SOCF and continuing at Trumbull Correctional Facility, John requested assistance in preparing for release.  He specifically requested assistance in enrolling in disability benefits and supportive housing.  Prison staff at SOCF told him that the institution had "dropped the ball" on his benefits applications.  When he did not receive assistance, he filed grievances.

88.     John served in the United States military from 1974 to 1976 but has not received information about the services and benefits offered to veterans or how he might access them.

89.     John received only a 14-day supply of his psychiatric medication (his did not received medications for his other physical ailments, including his blood pressure medication) when he left Trumbull Correctional Facility.  He did not have insurance and did not know how to pay for or even continue his psychiatric care.  He ran out of medication. Exasperated, he called the Veterans Health Administration, getting the number from the Yellow Pages.  The VA immediately placed him in a residential treatment program for individuals with co-occurring mental health and substance  abuse disorders.  He currently resides at a VA hospital.

90.     John believes he can stay out of the criminal justice system if he has access to mental health and supportive services, which he greatly needs after spending eight years incarcerated.

91.     Based on information and belief, John's discontinuity of care and near-decompensation are the direct results of the ODRC's failure to provide him with the required pre-discharge planning and assistance.  "If I didn't have the VA," John recently stated, "I'd be – I don't know where I'd be".

**Guy B.**

92.     Guy B. is 50 years old.  He will be released from Marion Correctional Institution on October 30, 2010, concluding his fourth incarceration within ODRC institutions. Over the last decade, he has exhibited a pattern of release and reoffense.  His first ODRC sentence expired in 2000.  He reoffended less than three months later and returned to ODRC.  He was released in 2003, reoffended in 2004, was released in 2005, and again reoffended in 2006. Guy was sentenced in 2007 – the term from which he will now imminently be released.

93.     Between incarcerations, Guy was homeless and slept under bridges, in abandoned dog houses, and in "crack houses."  To cope with his untreated mental illness, he resorted to "street drugs."  His drug addiction sparked this series of petty offenses and brief incarcerations.

94.     Guy has been diagnosed with bipolar disorder and schizophrenia.  He currently takes the medications Risperdal, Welbutrin, and Elavil, and has been on Abilify, Haldol, Prozac, and Buspar.  He has attempted suicide several times, most recently in January 2007 at the Lorain County jail, when he attempted to break an overhead light and cut himself with the glass.  At that time, he was awaiting transfer to Marion Correctional Institution to serve the current sentence.

95.     When not medicated, Guy hears voices and experiences insomnia and paranoia.  He situates himself in the corners of rooms to avoid "crying about who's coming up behind me."  "When I take the Risperdal," he states, "I don't have that problem.  It makes me feel at peace."

96.     Guy grew up in Vermilion, OH, in Lorain County.  He did not complete high school but earned a GED in 1983.  At Marion, he works with sheet metal through Ohio Prison Industries and also makes chair cushions, for which he earns $2.54 per day.  He enjoys the work.

97.     ODRC and ODMH did not assist Guy with discharge planning related to his severe mental illness prior to any of his releases.  He was not coached on how to manage his serious mental illness, nor was he connected to any local mental health agency or service providers.  He was not informed of, nor enrolled in, public benefits that would have enabled him

to continue his medications or to receive income support.  As before, he does not know where he is going or how to continue treatment when he leaves ODRC custody in October.

98.     Despite his psychiatric disability and homelessness, Guy took great efforts to succeed following his past releases.  At one point he submitted signatures of over 70 potential employers at supermarkets, car washes, and home improvement stores, to his parole officer to verify his employment search.  His efforts have been thwarted by the lack of discharge planning and gaps in accessing necessary medication.  Guy remains eager to continue his mental health care following his release from ODRC and to avoid further contact with the criminal justice system.  He states: "I don't want to be like the guys in here with canes and wheelchairs."

99.     Based on information and belief, Guy's repeated contact with the criminal justice system and his inability to successfully transition into his community are direct results of the ORDC's failure to provide him with required pre-discharge planning and assistance.

100.     Further, based on information and belief, it is imminently likely that, based on prior policy and practice of ODRC and ODMH, that Guy will not receive adequate pre-release discharge planning prior to his release in October, 2010.  The result of this lack of adequate pre-release discharge planning will likely be reincarceration.

**B.     Defendants**

101.     Defendant ODRC is the agency created by the State of Ohio for the purpose of managing Ohio's prisons, including the supervision of the inmate population placed under the authority of ODRC.  As part of its function, ODRC is required to provide pre-release planning to insure appropriate conditions for the release of mentally disabled inmates into the community.  According to its stated mission, ODRC "protects and supports Ohioans by ensuring that adult felony inmates are effectively supervised in environments that are safe, humane, and appropriately secure.  In partnership with communities, [ODRC] will promote citizen safety and

23

victim reparation. Through rehabilitative and restorative programming, [ODRC] seek[s] to instill in inmates an improved sense of responsibility and the capacity to become law-abiding members of society."  ODRC is a public entity under 42 U.S.C. §§ 12131(1) and 12132, and the various programs that ODRC administers includes programs or activities that receive federal financial assistance under 29 U.S.C. § 794(a) and (b).

102.    Defendant Ernie L. Moore is the Director of ODRC.  In his capacity as Director, Defendant Moore has authority over the operations of all Ohio correctional institutions, including decisions and policies related to pre-release discharge planning for all inmates, including those inmates with psychiatric disabilities.  As such, Defendant Moore is responsible for ODRC's activities in planning and arranging for the release of prisoners into the community, the supervision of released prisoners, and ensuring that ODRC operates in a manner that complies with the requirements of federal law, including the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Rehabilitation Act").  He is also responsible for overseeing the training and supervision of all ODRC staff that are based in state correctional facilities and responsible for pre-release planning. Defendant Moore is sued in his official capacity.

103.    Defendant ODMH is the agency created by the state of Ohio for the delivery of public mental health services across the state.  ODMH is charged with assuring access to quality mental health services for Ohioans at all levels of need and life stages.

104.    Defendant Sandra Stephenson is the Director of ODMH.  In her capacity as Director, Defendant Stephenson has authority over all the operations of ODMH, including its role, pursuant to its Partnership Agreement with ODRC, in pre-release discharge planning for

24

inmates with psychiatric disabilities that are being released from Ohio prisons. Defendant Stephenson is sued in her official capacity.

## JURISDICTION AND VENUE

105. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 343(a)(3) and (4). The controversy arises under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; 42 U.S.C. § 1983; the Constitution of the United States, and federal common law. The Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a) over any additional claims that may arise under State law.

106. Venue properly lies in this District under 28 U.S.C. § 1391(b)(1) and (2).

## CLASS ACTION ALLEGATIONS

107. Plaintiffs bring this action on behalf of themselves and a class consisting of individuals who (a) have a psychiatric disability that substantially limits one or more major life activities within the meaning of the Americans with Disabilities Act, (b) are currently incarcerated in an Ohio corrections facility and who are eligible to be released into an Ohio community or who have been recently released from an Ohio corrections facility into an Ohio community, and (c) are eligible, or upon release will be eligible, for one or more of the following public benefits programs: Medicaid, Medicare, Social Security Disability Insurance ("SSDI"), Supplemental Security Income ("SSI"), and Food Stamps, and (d) have demonstrated histories of recidivism..

108. This action meets the requirements of Fed. R. Civ. P. 23(a) as follows:

a. The proposed class is so numerous that joinder of all its members is impracticable. Upon information and belief, there are thousands of indigent individuals who (a) have a psychiatric disability that substantially limits one or more major life activities within the meaning of the Americans with Disabilities

Act, (b) are each a "qualified individual with a disability" as defined under the ADA, 42 U.S.C. § 12131(2) and C.F.R.. § 35.104, (c) are currently incarcerated in an Ohio corrections facility and who are eligible to be released into an Ohio community or who have been recently released from an Ohio corrections facility into an Ohio community, and (d) are eligible, or upon release will be eligible, for one or more of the following public benefits programs:  Medicaid, Medicare, SSDI, SSI, and Food Stamps.  In addition, joinder of all members of the proposed class is impracticable because membership of the proposed class constantly changes, as additional persons are sentenced and come under the authority of ODRC.

   b.  The questions of law and fact presented by the Plaintiffs are common to other members of the class.

   c.  Such questions include, generally, whether, under federal and state law, Defendants sufficiently accommodate the disabilities of indigent individuals with psychiatric disabilities who are being readied for release under the Offender Transitional Release Plan so that they are able to participate successfully in the public benefits programs for which they are or will be eligible, and more specifically:

      i.  whether Defendants adequately assist Plaintiffs and the class they represent prior to their release in securing appropriate mental health services so that they are able to successfully transition to life in the communities to which

they are released and are able to access the mental health

services for which they are eligible;

    ii.    whether Defendants adequately assist Plaintiffs and the

class they represent prior to their release in securing other

needed services for which they are eligible, including

public benefits and housing, so that they have access to

those benefits immediately upon their release;

    iii.    whether Defendants have taken sufficient steps to provide

their employees and agents with the appropriate

information, training, procedures and supervision necessary

to comply with the requirements of federal and state law,

including the ADA and the Rehabilitation Act; and

    iv.    whether Defendants' policies and procedures make the goal

of transition into the community significantly more difficult

for Plaintiffs and the class they represent who have

psychiatric disabilities than for those who do not have

psychiatric disabilities, because of the lack of appropriate

reasonable accommodations for inmates who have

psychiatric disabilities.

    d.    The violations alleged by Plaintiffs are typical of those suffered by

the class.  The entire class will benefit from the relief sought.

    e.    Plaintiffs will fairly and adequately protect the interests of the

class.  Plaintiffs have no interests adverse to or in conflict with those of the other

class members. Jack B. Harrison and Shannah Morris, Frost Brown Todd, the Ohio Justice and Policy Center, and Advocates for Basic Legal Equality, co-counsel for Plaintiffs, are experienced in class action and civil rights litigation.

109. The prosecution of separate individual actions by Plaintiffs and the class they represent would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for the party opposing the class. Fed. R. Civ. P. 23(b)(1)(A).

110. Defendants have acted or refused to act on grounds generally applicable to the class, making appropriate final injunctive or corresponding declaratory relief with respect to the class as a whole. Fed. R. Civ. P. 23(b)(2).

## FACTUAL ALLEGATIONS

**A.** **The Ohio Plan for Productive Offender Reentry and Recidivism Reduction ("The Ohio Plan") and the "Offender Transitional Release Plan"**

111. As set forth in The Ohio Plan for Productive Offender Reentry and Recidivism Reduction ("The Ohio Plan"), one of the missions of ORDC is to develop a "system of reentry [that] will provide opportunities for inmates to successfully connect as productive members of society." As developed and administered by ODRC, The Ohio Plan is intended to support inmates' successful reintegration into their home communities while at the same time protecting community safety. The mission of ODRC in the Reentry Initiative under The Ohio Plan is to develop a "holistic and systematic approach that seeks to reduce the likelihood of additional criminal behavior. Beginning at sentencing and extending beyond release, reentry will assess, identify and link inmates with services specific to their needs. This will be accomplished through associations with community partners, families, justice professionals and victims of crime."

112.     Under Ohio law, prisoners convicted of offenses and sentenced to incarceration in state facilities are released, at the conclusion of their terms or on conditions of parole, into the community in accordance with ODRC's Offender Transitional Release Plan.

113.     The purpose of the Offender Transitional Release Plan is to provide procedures governing transitional release planning to facilitate the offender's successful release into the community.  This purpose is defeated when prisoners with psychiatric disabilities are released without the reasonable accommodations needed to allow them to access the many public programs for which they are eligible and which would enable them to participate successfully in the community.

114.     Because they are indigent, Plaintiffs and the class they represent are qualified under 42 U.S.C. § 12131(2) for one or more of the public benefits programs, activities and services made available through or facilitated by ODRC.  These programs include Social Security Disability Insurance ("SSDI"), Supplemental Security Income ("SSI"), Food Stamps, Medicaid, and Medicare.  They have met or will meet the essential eligibility requirements of one or more of these public benefits programs by virtue of their lack of income and financial resources.

115.     Pursuant to ODRC policy, 78-REL-01, Offender Transitional Release Planning, ODRC staff is to determine whether inmates who are scheduled to be released qualify for various public benefit programs, such as SSDI, SSI, Medicaid, Medicare, and/or Food Stamps.

116.     Pursuant to ODRC policy, 78-REL-01, Offender Transitional Release Planning, at the time of their release, inmates, including those with psychiatric disabilities, are

provided with only a 14-day supply of essential medications and, where follow-up care is indicated, inmates are provided with a list of medical referral sources.

117.    ODRC has long acknowledged the necessity of pre-release planning and transitional services for prisoners with psychiatric disabilities, and has accepted primary responsibility for meeting this need.  In practice, however, prisoners with psychiatric disabilities are thrust from a highly structured prison environment into Ohio communities with little to no preparation, and with the implicit assumption that they will be largely self-sufficient immediately upon release.

118.    ODRC releases inmates, with psychiatric disabilities, from a highly structured prison environment, where they receive case management services, medication and treatment, into Ohio communities without adequate discharge planning and with little or no regard for the consequences that will ensue, including reincarceration when unmanaged psychiatric disabilities lead to probation violations or criminal behavior.

119.    ODRC has delegated certain of its obligations for pre-release discharge planning for those inmates with psychiatric disabilities to the Ohio Department of Mental Health ("ODMH"), pursuant to a Partnership Agreement or Memorandum of Understanding that both agencies renewed in August 2009.

120.    Under the  Partnership Agreement, ODMH, through its Community Linkage Social Workers, is charged with providing pre-release discharge planning for inmates with psychiatric disabilities, including connecting offenders with mental health services in the community in which they will be discharged and insuring that offenders are discharged with appropriate medications.

121. Pursuant to the Partnership Agreement, the Ohio Department of Mental Health is charged with seeing that inmates with psychiatric disabilities complete Medicaid applications thirty days prior to release and forwarding these documents to the office of the Ohio Department of Job and Family Services in the county where the inmate is being released.

122. Neither ODRC nor the ODMH has procedures in place to insure that inmates with psychiatric disabilities are provided medication necessary for the management of their psychiatric disability or the means to obtain such medication following the release.

123. Defendants' failure to engage in necessary pre-release planning for these inmates results in a "revolving door" phenomenon in which inmates with psychiatric disabilities are released without adequate support and accommodations, and are then reincarcerated for manifestations of their psychiatric disabilities.

124. Defendants fail to provide Plaintiffs and the class they represent with requisite pre-release accommodations, including but not limited to facilitating the submission of pre-release applications for assistance that would enable eligible Plaintiffs and the class they represent to obtain SSI, SSDI, Food Stamps, Medicaid, and Medicare immediately upon or shortly after their release from prison, connecting the offender with mental health services in the community in which they will be discharged, and insuring that the offender is discharged with appropriate medications. These accommodations would allow Plaintiffs and the class they represent to make a successful transition from the prison and into a community. Defendants could make important improvements in pre-release planning by taking a series of easy steps at little or no additional cost, yet they have failed to do so.

**B.** **Defendants Fail to Afford Plaintiffs and the Class They Represent Reasonable Accommodations for Their Disabilities and an Equal Opportunity to Participate in Available Programs.**

125.    Under the federal Food Stamp and Medicaid Acts, Plaintiffs and the class they represent are entitled to submit pre-release applications for assistance that would enable eligible Plaintiffs and the class they represent to obtain SSI, SSDI, Food Stamps and Medicaid immediately upon or shortly after their release from prison.  ODRC does not enable Plaintiffs and the class they represent to submit pre-release applications in sufficient time, if at all, to obtain Food Stamps, Medicaid, SSDI and/or SSI immediately upon release, in violation of the federal law.

126.    When released without needed health care, without appropriate housing, and without means to meet their immediate needs, Plaintiffs and the class they represent are unable to successfully transition to the community and face repeated reincarceration caused by manifestations of their untreated psychiatric disabilities.

127.    While incarcerated, Plaintiffs and the class they represent are provided with medication, treatment, case management and other mental health services.  These services may include periodic consultations with a psychiatrist or therapist, and administration of psychotropic medication.  Plaintiffs and the class they represent are also provided with food and shelter, in a highly structured environment in which they make relatively few decisions about their care.

128.    In contrast, when Plaintiffs and the class they represent transition from prison into the community, many abruptly find themselves without arranged mental health services, without stable housing, without case management services, and without the means to pay for necessities like food, housing, toiletries, or even a winter coat.

32

129.    From their first day outside prison walls, Plaintiffs and the class they represent are expected to manage their treatment and meet their own needs with minimal external support, but most have little ability to do so.  Many are unable to manage complex schedules of mandated appointments, and are unable to make use of paper referrals without additional assistance.  As a result, many Plaintiffs and the class they represent do not receive necessary mental health treatment, do not find appropriate housing, and cannot find the stable external environment that they need "to successfully connect as productive members of society."

130.    ODRC and ODMH maintain this system for release of inmates with psychiatric disabilities that requires Plaintiffs and the class they represent  to manage their treatment and meet their own needs with minimal external support, knowing that most if not all of the inmates released by this system will fail to meet their most basic personal and psychiatric needs, including being able to manage complex schedules of mandated appointments and accessing necessary referrals without additional assistance.

131.    As a direct and proximate cause of the action and or inaction of the Defendants, Plaintiffs and the class they represent do not receive necessary mental health treatment, do not find appropriate housing, and cannot find the stable external environment that they need in order to successfully transition from incarceration to living in communities into which they were released.

132.    A stable external environment--for example, a situation in which a released inmate has access to mental health counseling, receives case management services, is able to pay for prescribed medication, as well as for food and clothing, and has a safe and reliable residence--increases the likelihood that Plaintiffs and the class they represent will be able to manage the symptoms of mental illness and make a successful transition into the community.

Without a stable external environment, many Plaintiffs and the class they represent are unable to manage their symptoms, finding their lives dominated by their mental illness and resulting struggles.  Many also decompensate (suffer an acute deterioration of their mental health), which further diminishes their ability to think and carry on daily activities.  As explained in more detail below, for many Plaintiffs and the class they represent, the chaotic environment of a homeless shelter makes attaining external stability even more difficult.

133.    The symptoms experienced by Plaintiffs and the class they represent often severely impair their ability to manage ordinary life activities.  For example, some Plaintiffs and the class they represent have schizophrenia, a chronic and often disabling brain disease whose symptoms include hallucinations, delusions, and unusual or disorganized speech, thinking and behavior.  Others have anxiety or mood disorders, whose symptoms include paralyzing fear, debilitating emotional extremes, and sometimes hallucinations or delusions as well. Plaintiffs and the class they represent often take psychotropic medication, which can be heavily sedating or cause additional adverse effects.  Each illness or medication side-effect can limit their ability to carry out daily activities, for example, by impairing the ability to think, concentrate, process information, remember, travel on public transportation, or interact with others.  Instability in other aspects of an individual's life may further impair the ability to function.  To make a successful transition into the community, Plaintiffs and the class they represent require reasonable accommodations in the form of pre-release planning and transitional supports.

134.    When appropriate planning and transitional supports are not provided, the abrupt loss of services and increased demands on the ability of Plaintiffs and the class they represent to manage the tasks of daily life create predictable and preventable exacerbations of their symptoms.  Any worsening of the symptoms experienced by Plaintiffs and the class they

represent further erodes their already limited ability to successfully transition into the community.

135.    Further, the lack of adequate pre-release planning has a disparate impact on Plaintiffs and the class they represent.  The challenges discussed above make it significantly more difficult for Plaintiffs and the class they represent to make a successful transition into the community than for inmates released without psychiatric disabilities.  As a result, a larger percentage of Plaintiffs and the class they represent are reincarcerated when compared to the general prison population.

136.    As a direct and proximate result of Defendants failure to provide needed accommodations, the illnesses suffered by Plaintiffs and the class they represent leave them with a drastically reduced ability to access the services available to them and for which they are eligible, greatly increasing their risk of parole violations or the commission of new crimes and a return to prison.

137.    As a direct and proximate cause of Defendants' failure to provide appropriate planning and transitional supports, including the abrupt loss of services, Plaintiffs and the class suffer predictable and preventable exacerbations of their symptoms, further eroding their already limited ability to successfully transition into the community.

138.    As a direct and proximate cause of Defendants' failure to provide adequate pre-release planning, Plaintiffs and the class they represent have been disparately impacted, in that making a successful transition into the community is made significantly more difficult for Plaintiffs and the class they represent than for inmates released without psychiatric disabilities.  As a result, a larger percentage of Plaintiffs and the class they represent are reincarcerated.

139.    Defendants knew or should have known that reasonable accommodation are necessary to provide Plaintiffs and the class they represent an equal opportunity to make a successful transition into the community into which they are released.

140.    Defendants failed to provide necessary reasonable accommodations preventing Plaintiffs and the class they represent from making a successful transition into the community into which they are released.

141.    As a direct and proximate cause of Defendants' failure to provide necessary reasonable accommodations, Plaintiffs and the class they represent were unable to successfully transition into the community into which they are released.

**C.    Defendants Fail to Arrange for Timely and Appropriate Mental Health Services as Required to Afford Plaintiffs and the Class They Represent Reasonable Accommodations for Their Disabilities and an Equal Opportunity to Successfully Transition Into The Community.**

142.    Plaintiffs and the class they represent require community-based mental health services in order to control their symptoms, access available services, meet any requirements of their release, and to successfully transition into the community.

143.    Community-based mental health services include a range of services, such as medication, individual or group therapy, treatment for co-occurring substance abuse disorders, vocational rehabilitation, and residential mental health and substance abuse treatment.

144.    Plaintiffs and the class they represent may also need some degree of mental health case management, which includes a range of services based on the needs of the individual, for example:  (1) facilitating service delivery, including helping individuals make and keep appointments, escorting individuals to appointments as needed, and arranging mental health, medical and psychiatric rehabilitation services; (2) advocating for and assisting

individuals to gain access to public benefits or health-related services; and (3) assisting individuals to manage their finances and increase their independence.

145.     Under the existing terms of the Offender Transitional Release Plan and the Partnership Agreement, Defendants ODRC and ODMH share primary responsibility for pre-release discharge planning for the release of prisoners with psychiatric disabilities.

146.     Through their various policies, Defendants ODRC and ODMH have acknowledged that pre-release discharge planning should include assistance in obtaining appropriate mental health services.

147.     Nevertheless, Defendants have failed to implement needed services systematically and on the scale necessary to accommodate Class Members' disabilities.

1.     <u>Defendants Fail to Provide a System to Arrange for Timely and Appropriate Medical and Mental Health Services.</u>

148.     As a condition of their release, Plaintiffs and the class they represent are often required to undergo some form of mental health treatment.  Plaintiffs and the class they represent have received treatment while in prison or have requested appropriate services, so that Defendants knew or should have known of Plaintiffs' illnesses and need for continuing care.

149.     Defendants fail to provide a system to ensure that Plaintiffs and the class they represent receive continuous treatment as needed to accommodate their disability and to allow for a successful transition into the community once they are released.

150.     Plaintiffs and the class they represent are released without appropriate community mental health referrals being scheduled prior to their release.

151.      Plaintiffs and the class they represent are released having been instructed that the individual overseeing their release under PRC or the Community Linkage Social Worker (overseen by ODMH) will provide a referral for services. Referrals made through this system are

37

for screening and intake evaluation only, and may be with a social worker or other professionals who are unable to prescribe medication.  Many released inmates are not assigned to meet a treating physician until a much later date, and may go for months without meaningful mental health treatment.

152.    Defendants' system delays the beginning of treatment, sometimes for a considerable period:  some public hospitals, for example, have a policy or practice of scheduling intake appointments two or more months in advance of intake.  By the time they can be seen, Plaintiffs and the class they represent have run out of medication, been reincarcerated, or become acutely ill because of the lack of care.  Plaintiffs and the class they represent are often unable to advocate for themselves and to follow through on appointment referrals; without case management or similar services, they may never find a treating physician at all.  Every delay, therefore, adds an additional, unnecessary barrier to successful transition into the community in which Plaintiffs and the class they represent are released.  Such unnecessary delays in obtaining adequate mental health care are particularly pernicious when Plaintiffs and the class they represent are first released, the most challenging time for community re-integration.

153.    Plaintiffs and the class they represent require medication to manage the symptoms of their psychiatric disabilities.  The Medicaid program provides health insurance coverage that covers the cost of such medication and treatment for indigent persons.  When an application for Medicaid is submitted, a 45-day waiting period typically applies before the Medicaid application is granted.

154.    Defendants fail to submit Medicaid applications on behalf of inmates far enough in advance of the inmates' release to ensure that they are covered by Medicaid promptly upon their re-entry into the community.

155.    Upon release from prison, inmates with psychiatric disabilities who take medication are commonly given two weeks' worth of medication and a referral for followup care after release.   Plaintiffs and the class they represent are not provided Medicaid coverage immediately upon release from prison.

156.    As a direct and proximate cause of Defendants' failure to submit pre-release Medicaid applications in a sufficient amount of time prior to release, there is a gap in coverage between the date when the medications received upon release run out and the date when Medicaid becomes active and new prescriptions can be obtained and filled.

157.    Plaintiffs and the class they represent often exhaust the supply of necessary medication long before they can obtain refills.   An appointment with a physician who accepts Medicaid cannot be scheduled on the first day when Medicaid becomes active. Obtaining the necessary medical appointment after Medicaid becomes active takes several weeks or even months.

158.    Plaintiffs and the class they represent are unable to complete the paperwork and application process to apply for Medicaid without assistance due to their psychiatric disabilities, lack of access to required supporting documentation, and consultative examinations required to determine eligibility for Medicaid.

159.    Pursuant to Ohio Administrative Code 5101:1-38-01 administrative agencies are required to assist a Medicaid applicant by *"…. (1) Render assistance and determine eligibility and benefits without discrimination on account of race, religion, disability, national origin, political beliefs, age, or sex in a manner consistent with the United States Constitution, Social Security Act, Civil Rights Act, and the Constitution of the state of Ohio"* and *"… (5)*

*Upon request, provide assistance to individuals having difficulty completing an application or gathering verifications."*

160.     Providing inmates with psychiatric disabilities who are being released from prison, and who are applying for Medicaid, with assistance in obtaining the necessary documentation and consultative examinations required for a determination of Medicaid eligibility is a reasonable accommodation required by the Americans with Disability Act and Section 504 of the Rehabilitation Act.

161.     As a direct and proximate cause of Defendants' failure to provide inmates, with psychiatric disabilities who are being released from prison, and who are applying for Medicaid, with assistance in obtaining the necessary documentation and consultative examinations required for a determination of Medicaid eligibility, Plaintiffs and the class they represent are unable to obtain Medicaid coverage at the time of their release or are denied Medicaid coverage due to an incomplete application.

162.     As a direct and proximate cause of Defendants' failure to provide inmates with psychiatric disabilities, who are being released from prison, with a system to apply, qualify and receive Medicaid coverage, starting on the day of their release, Plaintiffs and the class they represent are unable to access adequate medical care and mental health services, resulting in, among other things, decompensation and deterioration of their underlying conditions, increased hallucinations, delusions, anxiety, depression, and a decrease in ability to function at a level necessary to meet their daily personal care needs.

163.     As a direct and proximate cause of Defendants' failure to provide inmates with psychiatric disabilities who are being released from prison with a system to apply, qualify and receive Medicaid coverage starting on the day of their release, Plaintiffs and the class they

40

represent are unable to access adequate medical care and mental health services, resulting in their inability to comply with the conditions of their release, or successfully transition into the community into which they are released, which increases the likelihood of reincarceration.

2.    Defendants Fail to Arrange for Case Management and Related Services.

164.    Plaintiffs and the class they represent require case management services, including, but not limited to the following:

a.  Assistance with identifying medical and mental health services that are appropriate and available in the community into which they are being released;

b.  Scheduling of appointments with medical and mental health services in the community into which they are being released and assistance with transportation to and from those appointments;

c.   Providing necessary assistance with medication management, including ensuring that medications necessary for treatment of their psychiatric condition is taken at correct times and in the correct doses; and

d.  Providing necessary assistance in securing safe and adequate housing, food and other available community services as needed.

165.    Providing inmates with psychiatric disabilities who are being released from prison with adequate case management services is a reasonable accommodation required by the Americans with Disability Act and Section 504 of the Rehabilitation Act.

166. As a direct and proximate cause of Defendants' failure to provide inmates with psychiatric disabilities, who are being released from prison, with adequate case management services starting on the day of their release, Plaintiffs and the class they represent are unable to access adequate medical care and mental health services, resulting in the inability to manage their daily activities and advocate for themselves to get appointments when needed, and further resulting in decompensation and deterioration of their underlying conditions, increased hallucinations, delusions, anxiety, depression, or other symptoms, and a decrease in ability to function at a level necessary to meet their daily personal care needs.

167. As a direct and proximate cause of Defendants' failure to provide inmates with psychiatric disabilities who are being released from prison with adequate case management services starting on the day of their release, Plaintiffs and the class they represent are unable to access adequate medical care and mental health services, resulting in their inability to comply with the conditions of their release, or successfully transition into the community into which they are released, which increases the likelihood of re-arrest and reincarceration.

**D.  Defendants Fail to Arrange for Timely and Appropriate Public Benefits as Required to Afford Plaintiffs and the Class They Represent Reasonable Accommodations for Their Disabilities and an Equal Opportunity to Successfully Transition Into The Community Into Which They Are Released.**

168. While Plaintiffs and the class they represent are expected to find some legitimate means of supporting themselves as they transition into the community, those who are too ill to work or are unable to secure employment must typically seek and obtain public benefits if they are to meet their immediate needs. Indigent inmates are eligible for one or more income-support programs upon their release, including SSI, SSDI, Food Stamps, and Medicaid. SSI provides income. Medicaid provides health insurance coverage, which is needed to receive the mental health treatment typically required for a successful transition. Receipt of SSI and SSDI

42

can also serve as proof of the medical need that is required to establish eligibility for supportive

housing and for case management, either of which can reduce or compensate for the functional

impairments caused by psychiatric disabilities.  SSI and SSDI may also speed access to

vocational rehabilitation.

> 1.      Defendants Fail to Submit Timely Applications for Federal
>         Disability Benefits.

169.    The Social Security Administration has a statutory obligation to develop

systems to allow individuals to apply for SSI and SSDI prior to release from State prison.

170.    Despite this, Defendants ODRC and ODMH do not have an adequate

system for assessing the needs of Plaintiffs and the class they represent and for submitting these

applications effectively on behalf of eligible individuals.  Despite the fact that Plaintiffs and the

class they represent would qualify for SSI and SSDI upon their release, Defendants fail to assist

many of these individuals in applying for these benefits before release.  As a result, Plaintiffs and

the class they represent whose medical conditions are severe enough to meet the disability

criteria for SSI and SSDI either are not provided SSI and SSDI benefits or, in the event they

ultimately do apply, have their applications denied.  Even when they do submit applications for

inmates with psychiatric disabilities prior to their release, Defendants have usually delayed the

submission for so long that there is virtually no chance that benefits will in fact be available to

eligible inmates upon their release.

171.    Some inmates with psychiatric disabilities received SSI and SSDI prior to

incarceration.  In most cases, it is easier for these individuals to be awarded SSI and SSDI on

new applications because SSA can review their prior disability files to assist them in making a

determination.  Despite this, Defendants fail, in pre-release discharge planning, to systematically

identify inmates who received SSI and SSDI prior to incarceration and to process new

43

applications for them so that they can receive SSI and SSDI upon release.  As a result, most individuals who qualify for SSI and SSDI are forced to apply on their own when they are released from prison.

172.    Defendants' failure to submit these applications prior to the release from prison of Plaintiffs and the class they represent results in significant delay, and sometimes means that benefits are never received or that Plaintiffs and the class they represent are reincarcerated before their application can be approved.  Applications for SSI and SSDI take approximately three to five months to process, and appeals following an initial denial can take more than a year. During this time, the applicant is forced to survive with little or no financial support while the application is pending. Plaintiffs and the class they represent, because of their psychiatric disabilities, are unable to complete the paperwork and follow through on the appointments needed to apply.  Defendants' failure, therefore, means that some do not receive SSI and SSDI benefits at all.

        2.      <u>Defendants Fail to Submit Timely Applications for Medicaid</u>.

173.    Defendants also fail to submit timely applications for Medicaid on behalf of Plaintiffs and the class they represent.  Medicaid applications may be submitted up to 45 days prior to release from prison.

174.    Because Defendants often fail to submit Medicaid applications even close to 45 days in advance of the release from prison of Plaintiffs and the class they represent, they are often not covered by Medicaid promptly upon their re-entry into the community.

        3.      <u>Defendants Do Not Allow Timely Applications for Food Stamps<br>and Public Assistance</u>.

175.    Defendants also fail to submit timely applications for Food Stamps.  In practice, the procedures in place do not result in the submission of Food Stamp applications far

enough in advance of the inmates' release to ensure that benefits are available upon their re-entry into the community.

176.    Plaintiffs and the class they represent do not have direct access to the Food Stamp application form prior to their release from prison.  For applications prepared prior to release, this form should be completed as part of the Offender Transitional Release Plan.

177.    Because Food Stamp applications are often not completed as part of the Offender Transitional Release Plan, Plaintiffs and the class they represent are routinely required to apply for Food Stamps after they are released from prison.  Because certain waiting periods may apply to these applications, Plaintiffs and the class they represent routinely experience gaps during which they have no Food Stamps.

178.    A Food Stamp application is supposed to be decided within 30 days. Although expedited Food Stamps are available for emergency food needs during the 30-day waiting period, even expedited Food Stamps need not be granted for five days.

179.    Although they are financially eligible for public benefits, Plaintiffs and the class they represent often will not receive those benefits after their release without reasonable accommodations for their disability.  Because of the complexity of the application process, it is very difficult for many individuals with psychiatric disabilities released from State prisons to secure Food Stamps without assistance to facilitate their enrollment and participation.  Plaintiffs and the class they represent are unable to maintain eligibility requirements for Food Stamps because the symptoms of their psychiatric disabilities render them unable to comply with the detailed bureaucratic requirements of these programs.  The failure to attend a single required appointment or to submit a single required document may result in the rejection of an application or termination of benefits.  In some cases, failure to attend an appointment is considered

"sanctionable," and may result in the applicant being barred from receiving benefits for a 90-day period.

180.     Because of gaps during which they have no Food Stamps, Plaintiffs and the class they represent often reenter the community without means to meet their most basic needs. This worsens their symptoms, interferes with their rehabilitation and community integration, reduces their access to available services and places them at increased risk of reincarceration.

### E.     Defendants Fail to Submit Timely Applications for Appropriate Housing and/or Mitigate the Deleterious Effects of Shelter Conditions.

181.     An offender's housing situation can greatly affect his / her chance of succeeding upon release. As the agency responsible for pre-release discharge planning, Defendant ODRC must review and approve the housing in which the released offender expects to live. Defendant ODMH shares responsibility for planning for the release of prisoners with psychiatric disabilities, particularly with regard to mental health related supportive services. Defendants acknowledge in various policies and in their Partnership Agreement that the pre-release discharge planning they provide should include assistance in obtaining appropriate housing.

### 1.     Defendants Fail to Submit Timely Applications for Appropriate Housing.

182.     For Plaintiffs and the class they represent, the most appropriate release plan would involve placement in supportive housing, which includes on-site or linked social services and is targeted at individuals with special needs.

183.     Although the need for housing by Plaintiffs and the class they represent is known to Defendants, Defendants do not have an adequate system for assessing their needs and

assisting them in securing appropriate housing. As a result, Plaintiffs and the class they represent are often relegated to homeless shelters.

> 2. Defendants Fail to Arrange for Supportive Services for Plaintiffs and the Class They Represent Released to Homeless Shelters.

184. Many persons with psychiatric disabilities are discharged from prison with no domicile other than a homeless shelter. In addition, others who are not initially discharged to a homeless shelter quickly end up in one because they do not receive the public benefits necessary to support themselves.

185. Use of a homeless shelter as part of a release plan creates an inherently unstable situation and poses particular risks for individuals with psychiatric disabilities. Shelters are typically crowded and chaotic, and cause acute distress for Plaintiffs and the class they represent who suffer from anxiety, depression, post-traumatic stress disorder, phobias, or any condition that impairs their ability to interact with others or to be in a crowded environment. Drug use by other shelter residents presents a hazard for Plaintiffs and the class they represent with a history of addiction. Further, individuals who display unusual behavior or appear vulnerable, like many with psychiatric disabilities, are at risk of attack. No matter what the shelter conditions are, however, where Plaintiffs and the class they represent flee such an inappropriate living situation following a deterioration of their mental health, that flight can often be found to violate the conditions of their release.

186. Plaintiffs and the class they represent have difficulty maintaining and managing a schedule of appointments under the best of circumstances; these tasks are even more difficult when they are homeless and staying in a shelter. Homeless shelters have no direct telephone service, limited ability to relay messages, and unreliable mail service. Most shelters also require residents to leave during the day but do not allow them to reserve beds, so that

individuals are faced with the constant anxiety and distraction of finding a space to sleep and to secure their belongings.

187.    When Plaintiffs and the class they represent must be released to a homeless shelter, reasonable accommodations are needed in order to allow them an opportunity to succeed.  These accommodations may include case management to help Plaintiffs and the class they represent coordinate their appointments and to ensure they receive needed health care and other services; they may also include assignment to parole officers with specialized training who are able to recognize signs of increasing impairment.  Without services to compensate for instability in their home environment, Plaintiffs and the class they represent commonly experience an exacerbation of their symptoms.  This leaves them unable to access the services available to them, to comply with the conditions of their release, and increases their likelihood of reincarceration.

**F.    Defendants Have Failed to Provide Their Employees and Agents with the Appropriate Information, Training, Procedures, and Supervision Necessary to Comply with the Requirements of Federal and State Law, including the ADA and the Rehabilitation Act.**

188.    Defendants are responsible for training and supervising staff who are supposed to provide inmates with psychiatric disabilities with pre-release discharge planning, as well as its field personnel who are supposed to supervise parolees.  Defendants have failed to adequately train and supervise its staff in the necessary tasks associated with pre-release discharge planning, including, but not limited to, assisting inmates with psychiatric disabilities in submitting applications for Social Security benefits, supportive housing and mental health services, Medicaid, and Food Stamps in a timely manner prior to their release from prison; informing Plaintiffs and the class they represent of their rights under these programs and services

available under them; and ensuring that they receive prescription medications and mental health services upon release and without interruption.

189.     As a result of Defendants' failure to adequately train and supervise their employees, individuals with psychiatric disabilities are released from prison without receiving the public benefits and mental health services they need in order to successfully transition into the community in which they are released.

## CLAIMS FOR RELIEF

190.     Based on the foregoing factual allegations, Plaintiffs assert the following claims for relief:

## FIRST CAUSE OF ACTION

(For discrimination under the ADA by all Defendants.)

191.     Plaintiffs re-allege and incorporate all of the foregoing allegations as if fully rewritten herein.

192.     Defendants ODRC and ODMH are public entities within the meaning of the ADA, 42 U.S.C. § 12131(1)(A) and (B), and U.S. Department of Justice implementing regulations, 28 C.F.R. § 35.104, or agents of such public entities.

193.     Plaintiffs and the class they represent have a psychiatric disability that substantially limits one or more of their major life activities --such as thinking, concentrating, interacting with others, caring for oneself, working, and remembering and processing information--as defined under the ADA, 42 U.S.C. § 12102(2) and 28 C.F.R. § 35.104.

194.     Plaintiffs and members of the class they represent are each a "qualified individual with a disability" as defined under the ADA, 42 U.S.C. § 12131(2) and 28 C.F.R. § 35.104, as an individual with a disability who, with or without reasonable accommodations to

rules, policies, or practices, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by the Defendants.

195.    Based upon the facts as alleged in this complaint, the actions and or inactions of the Defendants constitute actual or predictable discrimination against Plaintiffs' and the class they represent because of their disabilities by:

    a.    failing to make reasonable accommodations for disabled individuals with psychiatric disabilities, which denies or will deny such individuals an equal opportunity to access and participate in various public benefit programs and services for which they are eligible, in violation of Title II of the ADA and its implementing regulations, 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(b)(7);

    b.    failing to provide adequate pre-release discharge planning to insure appropriate mental health services are available to Plaintiffs and the class they represent, so they may access the services, programs, and activities available to them, places Plaintiffs and the class they represent at increased risk of violating the terms and conditions of their release, at increased risk for reincarceration, and violates the rights of Plaintiffs and the class they represent under the ADA;

    c.    failing to assist Plaintiffs and the class they represent in having access to and receiving all public benefits and services to which they are entitled (including Food Stamps, Medicaid, Medicare, SSDI and SSI) immediately upon release and using them to obtain medication and other basic necessities places them at increased risk of violating the terms and conditions of their release, at increased risk for reincarceration, and violates their rights under the ADA;

      d.     discharging individuals with psychiatric disabilities to homeless shelters without appropriate mental health services places Plaintiffs and the class they represent at increased risk of violating the terms and conditions of their release, at increased risk for reincarceration, and violates their rights protected under the ADA;

      e.     failing to adequately train and supervise their employees and agents to recognize and accommodate individuals with psychiatric disabilities when they are released from Ohio prisons violates the rights of Plaintiffs and the class they represent under the ADA;

      f.     failing to afford Plaintiffs and the class they represent the benefits and services for which they are eligible in a manner that is equal to others and failing to provide Plaintiffs and the class they represent with these benefits and services in a manner that is as effective in affording equal opportunity to obtain the same result, gain the same benefit and reach the same level of achievement as that provided to others, in violation of 28 C.F.R. § 35.130(b)(1)(ii)-(iii); and

      g.     using methods of administration that subject Plaintiffs and the class they represent to discrimination in violation of 28 C.F.R. § 35.130(b)(3)(i)-(iii) and (b)(8).

196.   Due to Defendants' failure to provide reasonable accommodations to address the psychiatric disabilities of Plaintiffs and the class they represent, they face a significantly increased risk of being unable, by reason of their psychiatric disabilities, to conform their conduct to the roles and conditions required by their release and/or required for a successful transition into the community in which they are released.

## SECOND CAUSE OF ACTION

(For discrimination under Section 504 of the Rehabilitation Act by all Defendants.)

197.    Plaintiffs re-allege and incorporate all of the foregoing allegations as if fully rewritten herein.

198.    Defendants are recipients, or agents of recipients, of "federal financial assistance," as defined by Section 504 of the Rehabilitation Act and the implementing regulations promulgated by the U.S. Department of Justice, the U.S. Department of Health and Human Services, and the U.S. Department of Agriculture, thereby rendering them subject to Section 504. 29 U.S.C. § 194(b)(1); 28 C.F.R. § 41.3(d), (e); 45 C.F.R. § 84.3(f), (h); 1 C.F.R. § 15b.3(f), (g).

199.    Plaintiffs and the class they represent have psychiatric disabilities that substantially limits one or more of their major life activities --such as thinking, concentrating, interacting with others, caring for oneself, working, and remembering and processing information--as defined under Section 504 of the Rehabilitation Act, 29 U.S.C. § 705(9)(B), (20)(B).

200.    Plaintiffs and the class they represent meet the essential eligibility requirements for the receipt of services and benefits and are therefore "qualified handicapped person[s]," as that term is defined in regulations implementing Section 504.  28 C.F.R. § 41.32; 45 C.F.R. § 84.3(1); 7 C.F.R. § 15b.3(n)(4).

201.    Based upon the facts as alleged in this complaint, the actions and or inactions of the Defendants constitute actual or predictable discrimination against Plaintiffs' and the class they represent because of their disabilities by:

a.    failing to make reasonable accommodations for inmates with psychiatric disabilities, which denies or will deny such individuals an equal

opportunity to access and participate in various programs and services that are available to them, in violation of Section 504 of the Rehabilitation Act. 29 U.S.C. § 794 and its implementing regulations, 28 C.F.R. §§ 41.51 and 41.56;

b.      failing to provide pre-release discharge planning, including appropriate mental health services for Plaintiffs and the class they represent and access to the services, programs, and activities for which they are eligible, which places Plaintiffs and the class they represent at increased risk of violating the terms and conditions of their release, at increased risk for reincarceration, and violates their rights protected under Section 504 of the Rehabilitation Act;

c.      failing to assist Plaintiffs and the class they represent in receiving public benefits for which they are eligible and to which they are entitled (including Food Stamps, Medicaid, Medicare, SSI and SSDI) immediately upon release, so that they may use them to obtain medication and other basic necessities, which places Plaintiffs and the class they represent at increased risk of violating the terms and conditions of their release, at increased risk for reincarceration, and violates their rights protected under Section 504 of the Rehabilitation Act;

d.      discharging individuals with psychiatric disabilities to homeless shelters without appropriate mental health services, which places Plaintiffs and the class they represent at increased risk of violating the terms and conditions of their release, at increased risk for reincarceration, and violates their rights protected under Section 504 of the Rehabilitation Act;

       e.      failing to adequately train and supervise their employees and agents to recognize and accommodate individuals with psychiatric disabilities who are released from Ohio prisons, which violates the rights of Plaintiffs and the class they represent under Section 504 of the Rehabilitation Act; and

       f.      failing to provide reasonable accommodations to address the disabilities of Plaintiffs and the class they represent, which places Plaintiffs and the class they represent at a significantly increased risk of being unable, by reason of their psychiatric disabilities, to conform their conduct to the rules and conditions required by their release and/or required for a successful transition into the community in which they are released.

202.    Defendants discriminate against Plaintiffs and the class they represent by failing to provide reasonable accommodations necessary for them to apply for, successfully obtain, and maintain eligibility for the programs and services of Food Stamps, SSI, SSDI, Medicare, and Medicaid, in violation of Section 504 of the Rehabilitation Act and its implementing regulations, 29 U.S.C. § 794(a) and 28 C.F.R. §§ 41.51 and 41.56.

203.    Defendants discriminate against Plaintiffs and the class they represent by:

       a.      failing to afford Plaintiffs and the class they represent the benefits and services for which they are eligible in a manner that is equal to others; and failing to provide them with these benefits and services in a manner that is as effective in affording equal opportunity to obtain the same result, gain the same benefit and reach the same level of achievement as that provided to others, in violation of 28 C.F.R. § 41.51(b)(1)(ii)-(iii); 45 C.F.R. § 84.4(b)(2) and (b)(1)(ii)-(iii); 7 C.F.R. § 15b.4(b)(4)(i)-(iii); and

b. using methods of administration that subject Plaintiffs and the class they represent to discrimination in violation of 28 C.F.R. § 41.5 1(b)(3 )(i)-(iii).

### **THIRD CAUSE OF ACTION**

(For violation of the Medicaid Act, actionable under 42 U.S.C. § 1983.)

204. Plaintiffs re-allege and incorporate all of the foregoing allegations as if fully rewritten herein.

205. 42 U.S.C. § 1396a(a)(8) of the Medicaid Act states, "A State plan for medical assistance must ... provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals."

206. Pursuant to authority delegated by the Ohio Department of Jobs and Family Services and a Partnership Agreement between ODRC and ODMH, Defendants have the authority and obligation to provide all inmates with mental illness wishing to apply for medical assistance and other benefits with the opportunity to do so, and to furnish such assistance with reasonable promptness.

207. Defendants fail to provide Plaintiffs and the class they represent the ability and opportunity to apply for medical assistance and fail to provide medical assistance with reasonable promptness, in that Defendants fail to provide the mechanism for Plaintiffs and the class they represent to apply for Medicaid sufficiently in advance of their release so that a system for prompt payment of claims for care and services is available upon their release, which deprives Plaintiffs and the class they represent of their rights under 42 U.S.C. § 1396a(a)(8) and 42 C.F.R. § 435.906, actionable under 42 U.S.C. § 1983.

## FOURTH CAUSE OF ACTION

(For violation of the Food Stamp Act, actionable under 42 U.S.C. § 1983)

208.    Plaintiffs re-allege and incorporate all of the foregoing allegations as if fully rewritten herein.

209.    7 U.S.C. § 2020(e)(2)(B)(i) of the Food Stamp Act provides that a state agency "shall establish procedures" that "provide timely, accurate, and fair service to applicants for, and participants in, the food stamp program."

210.    Pursuant to authority delegated by the Ohio Department of Jobs and Family Services and a Partnership Agreement between ODRC and ODMH, Defendants have the authority and obligation to establish procedures that provide timely, accurate, and fair services to inmates with mental illness who are applying for and participating in the food stamp program.

211.    7 U.S.C. § 2020(e)(3) of the Food Stamp Act provides that under a proper state plan of operation, a state agency shall "promptly determine the eligibility of each applicant household" in order to "complete certification of and provide an allotment retroactive to the period of application to any eligible household not later than thirty days following its filing of an application."

212.    Defendants have failed to establish procedures that allow timely, accurate, and fair service to applicants for, and participants in, the food stamp program, in that Defendants fail to provide a mechanism for Plaintiffs and the class they represent to apply for Food Stamps sufficiently in advance of their release so that benefits are available upon their release, which deprives them of their rights under the Food Stamp Act, 7 U.S.C. § 2020(e)(2)(B)(i) and (e)(3), actionable under 42 U.S.C. § 1983.

## FIFTH CAUSE OF ACTION

(For violation of the Prohibition Against Cruel and Unusual Punishment under the Eighth Amendment of the United States Constitution, actionable under 42 U.S.C. § 1983.)

213. Plaintiffs re-allege and incorporate all of the foregoing allegations as if fully rewritten herein.

214. Defendants, acting under the color of state law, have violated and continue to violate the right of Plaintiffs and the class they represent to be free from cruel and unusual punishment guaranteed by the 8th Amendment to the United States Constitution by being deliberately indifferent to the serious medical needs of Plaintiffs and the class they represent by withholding appropriate pre-release discharge planning services, actionable under 42 U.S.C. § 1983.

215. Plaintiffs and the class they represent have a psychiatric disability that constitutes a sufficiently serious medical need and Defendants know that failing to provide reasonable accommodations in pre-release discharge planning services for them creates a substantial risk to the health and safety of Plaintiffs and the class they represent.

216. Defendants failed to take reasonable measures to abate this risk.

## SIXTH CAUSE OF ACTION

(For violation of the Due Process Clause of the United States Constitution, actionable under 42 U.S.C. § 1983.)

217. Plaintiffs re-allege and incorporate all of the foregoing allegations as if fully rewritten herein.

218. Defendants, acting under the color of state law, have violated and continue to violate the property rights of Plaintiffs and the class they represent guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution by failing to provide reasonable opportunities for them to apply for various public benefits for which they are

eligible and to which they are entitled prior to their release from Ohio State prisons, actionable under 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court:

219.  Certify a plaintiff class pursuant to Fed. R. Civ. P. 23(b)(1) and (b)(2).

220.  Adjudge and declare that the policies, practices, omissions and conditions described above are in violation of the rights of Plaintiffs and the class they represent under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, the Medicaid Act, the Food Stamp Act, the Prohibition Against Cruel and Unusual Punishment under the Eighth Amendment of the United States Constitution, and the Due Process Clause of the United States Constitution.

221.  Declare that the continuing failure of Defendants to provide reasonable accommodations for the disabilities of Plaintiffs and the class they represent violates the ADA.

222.  Declare that the continuing failure of Defendants to provide reasonable accommodations for the disabilities of Plaintiffs and the class they represent violates Section 504 of the Rehabilitation Act.

223.  Declare that the continuing failure of Defendants to provide their employees and agents with the appropriate information, training, procedures, and supervision violates the ADA and Section 504 of the Rehabilitation Act.

224.  Declare that the continuing failure of Defendants ODRC and Moore to permit Plaintiffs and the class they represent to apply for Medicaid sufficiently in advance of their release so that benefits are available upon their release violates the Medicaid Act.

225.    Declare that the continuing failure of Defendant ODRC and Moore to permit Plaintiffs and the class they represent to apply for Food Stamps sufficiently in advance of their release to allow benefits to be available upon their release violates the Food Stamp Act.

226.    Enjoin Defendants, their successors, agents, servants, employees, and all those in active concert or participation with them from further:

        a.    failure to provide reasonable accommodations for the disabilities of Plaintiffs and the class they represent to enable them to participate in various programs and services of public assistance for which they are eligible, such as SSI, SSDI, Medicaid, and food stamps;

        b.    failure to provide their employees and agents with the appropriate information, training, procedures to provide appropriate pre-release discharge planning for Plaintiffs and the class they represent;

        c.    failure to assist Plaintiffs and the class they represent with pre-release application for Food Stamps, Medicaid, Public Assistance, and Social Security disability benefits; and

        d.    using methods of administration that subject class members to discrimination; and require Defendants to formulate a remedy, subject to the Court's approval and modification, if necessary, to end those practices.

227.    Retain jurisdiction in this case until the unlawful conditions, practices, policies, acts, and omissions complained of herein no longer exist and this Court is satisfied that they will not recur.

228.    Award Plaintiffs a reasonable attorney's fee, including litigation expenses, and costs pursuant to 42 U.S.C. § 12205 and 28 C.F.R. § 35.175 (for claims arising under the

ADA); 29 U.S.C. § 794a (for claims arising under the Rehabilitation Act of 1973); and 42

U.S.C. § 1988 (for all other federal statutory claims).

      229.    Grant and award such other and further relief as this Court deems just and

proper.

Dated:  _May 3, 2010_____

        Respectfully submitted,


        /s/ Jack B. Harrison_____
        Jack B. Harrison, # 0061993
        Shannah J. Morris, # 0079643
        FROST BROWN TODD LLC
        2200 PNC Center
        201 East Fifth Street
        Cincinnati, Ohio  45202-4182
        513-651-6800
        Facsimile:  513-651-6981
        Email: jharrison@fbtlaw.com
            smorris@fbtlaw.com


        /s/ David A. Singleton_____
        David A. Singleton, # 0074556
        Bess M. Okum, # 0064861
        Ohio Justice & Policy Center
        215 East 9th Street, Suite 601
        Cincinnati, OH 45202
        Phone:  (513) 421-1108
        Fax:  (513) 562-3200
        Email:  dsingleton@ohiojpc.org
            bokum@ohiojpc.org

/s/ Robert A. Cole
Robert A. Cole, # 0083053
Aneel L. Chablani, # 0083043
Advocates for Basic Legal Equality, Inc
Center for Equal Justice
525 Jefferson Avenue, Suite 300
Toledo, Ohio  43604
Voice: (419)255-0814
Fax: (419)259-2880
rcole@ablelaw.org
achablani@ablelaw.org
Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 3, 2010, I electronically filed the foregoing using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

_____*/s/ Jack B. Harrison*_____

CINLibrary 0116112.0563703 2000377v1